SPECIALTY TRANSPORTATION, INC., Plaintiff,

v.

UNITED STATES, Defendant.

No. 00–669C.

United States Court of Federal Claims.

May 2, 2003.

Philip M. Dearborn, Piliero, Mazza & Pargament, PLLC, Washington, D.C., for plaintiff.

Claudia Burke, Trial Attorney, Todd M. Hughes, Assistant Director, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION

HORN, Judge.

The plaintiff, Specialty Transportation, Inc. (Speciality), filed an initial complaint in this court on November 11, 2001, for amounts allegedly owed under Contract No. V689P–2563 with the United States Department of Veterans Affairs Connecticut Healthcare System (DVA). The complaint alleged that the defendant erroneously denied plaintiff compensation under the contract in the amount of $30,713.57. On February 7, 2001, the defendant answered the complaint and brought a counterclaim for $9,784.44, plus interest.

On July 18, 2001, the parties filed a joint motion to transfer and consolidate plaintiff's previously filed appeal with the Department of Veteran Affairs, Board of Contract Appeals, appeal No. 6212, with the above cap-

tioned case. According to the parties' joint motion, plaintiff's appeal with the Department of Veteran Affairs, Board of Contract Appeals, sought review of the contracting officer's decision to terminate the contract for cause. The parties' joint motion also identified the overlapping issues present in the plaintiff's appeal before the Department of Veteran Affairs, Board of Contract Appeals, and the plaintiff's complaint filed in this court. The parties' joint motion stated that:

> In order to determine whether the Government breached the contract, the Court must interpret the contract's provisions for payment in cases where multiple passenger trips are made outside city limits. Interpretation of the same contractual provisions will be required in order to determine whether the [sic] Specialty Transportation was justified in ceasing performance on the contract, and whether the Government appropriately terminated the contract for cause when Specialty Transportation stopped performing.

By order dated July 19, 2001, the court endorsed the parties' motion to transfer and consolidate the plaintiff's appeal at the Department of Veteran Affairs, Board of Contract Appeals, with this case. The Department of Veteran Affairs, Board of Contract Appeals, dismissed the plaintiff's appeal, with prejudice, by order dated July 30, 2001. The defendant had not asserted a counterclaim against the plaintiff in its answer to the plaintiff's appeal with the Department of Veteran Affairs, Board of Contract Appeals, but had done so in its answer to the plaintiff's initial complaint in this court.

On May 15, 2002, the plaintiff filed a motion to amend the complaint. Following a status conference held by the court, the plaintiff's amended complaint was filed, increasing the amount plaintiff claimed was due under the contract to $64,216.17. On June 28, 2002, the defendant filed an amended answer and counterclaim in which defen-

dant's counterclaim remained the same, $9,784.44.

### FINDINGS OF FACT

On or about September 1, 1998, plaintiff and the DVA entered into a contract under which Specialty agreed to provide transportation services for DVA beneficiaries. The contract specified:

> The contractor shall provide 24 hour chair car service for non-emergency trips for the beneficiaries of the Department of Veterans Affairs Connecticut Healthcare System (VA). Contractor shall transport patients to or from any pickup points, to or from any floor, ward, nursing home, patient's home, medical center facility, appointment area office, etc. Contractor shall use contractor-owned wheelchairs, linens or other items required by the contract provisions in transporting patient(s) from one place to another.

The base year of the contract was from December 1, 1998 to November 30, 1999. The contract also provided for four additional one-year extension options. Based on the estimated number of trips, the contract had a base-year value of $422,880.00 and a total value, including the four option years, of $2,197,120.00.

The contract provided that DVA would pay Specialty a fixed "base rate" for each trip, plus an additional payment for mileage for trips outside a twenty-five mile city limit. Section C of the contract provided the "Description/Specifications/Work Statement and Special Contract Requirements." Under Section C, the contract defined "Limits" and specified that: "For the purpose of this contract, the 25 mile radius is from the VA Campus located at 950 Campbell Avenue, West Haven, CT 06516." [1]

Under the subsection of titled "Number of Patients," Section C of the contract provided:

> It is understood and agreed that only one patient shall be transported on a trip unless specifically authorized by the VA.

---

1. The contract's clauses refer to "city limits" and a "25 mile radius" for reimbursement of the "mileage rate." The parties' cross-motions for summary judgment have not addressed whether "city limits" is defined as the "25 mile radius" as described in the subsection "Limits," of Section C of the contract. The parties, however, appear to use the terms interchangeably in their submissions to the court.

When, pursuant to the VA's authorization, more than one patient is transported concurrently on a trip, reimbursement will be made only at the rates contained in the Schedule for transporting a single patient. Regardless of the number of patients transported concurrently on a single trip within city limits, the contractor will be reimbursed for only the base rate for one trip. Regardless of the number of patients transported concurrently on a single trip beyond the city limits, the contractor will be reimbursed for the mileage rate for only one trip to the longest distance traveled with any one patient one [sic] that particular trip.

Section C of the contract also provided a subsection titled "Rates," which, in relevant part, provided the following:

Payment for mileage traveled beyond the 25 mile radius shall be one way only. Such mileage costs will be paid in addition to the applicable rate per trip for any trip entirely within the limits. The chair car basic rate will be applicable where both the origin and destination are within any one town. If the chair car returns for the patient, it is considered to be a second trip. Mileage is to be applied from point of origin to final destination. Trip mileage shall be determined by the latest edition of the Rand McNally Standard Mileage Guide.

Under the subsection titled "Orders" of Section C, the contract allowed the DVA to procure transportation services from another provider and charge the plaintiff for excess charges, as follows:

If the contractor fails to furnish requested services, within 30 minutes after receiving a request for unscheduled service or within 15 minutes of the scheduled pick-up time for appointments made in advance, the VA reserves the right to obtain services from another source and to charge the contractor with any excess cost which may result therefrom.

Section D of the contract contained numerous Federal Acquisition Regulation (FAR) contract clauses, including FAR 52.217-8, Option to Extend Services, and FAR 52.217-9, Option to Extend the Term of the Contract. Clause 52.217-8 provided that:

The Government may require continued performance of any services within the limits and at the rates specified in the contract. These rates may be adjusted only as a result of revisions to prevailing labor rates provided by the Secretary of Labor. The option provision may be exercised more than once, but the total extension of performance hereunder shall not exceed 6 months. The Contracting Officer may exercise the option by written notice to the Contractor within the period specified in the Schedule.

Clause 52.217-9, in relevant part, provided the following:

(a) The Government may extend the term of this contract by written notice to the Contractor within 20 days before contract expires; provided, that the Government shall give the Contractor a preliminary written notice of its intent to extend at least 60 days before the contract expires. The preliminary notice does not commit the Government to an extension.

Specialty began providing transportation services in December 1998. On December 11, 1998, Conrad Guenzel, the contracting officer (CO), sent a letter to Donna Grossman, President of Specialty, concerning numerous issues regarding Specialty's contract performance. Among the issues identified, CO Guenzel identified insufficient staffing to load and unload passengers, delivery of passengers at nondesignated locations, nonresponses to pages from DVA personnel, late pickups and unauthorized riders in the transport vehicles.

By letter dated January 7, 1999, CO Guenzel notified Specialty that "[s]ince the December 11 letter, there have been numerous incidents where Specialty did not meet the time requirements and on Saturday January 2, 1999, three of the thirteen patients scheduled for transport were never picked-up." The letter also informed Speciality that "the VA reserves the right to obtain the services from another source and charge the contractor with the costs or if another source is not sought, VA may elect to bill the contractor at the quarterly hour rate quoted in the sched-

ule for each quarter hour that a patient has to wait." The parties met further to discuss Specialty's performance under the contract in February and May 1999, and continued to correspond regarding the sufficiency and improvement of plaintiff's performance during June and August 1999.

According to the parties' joint stipulations, the plaintiff began submitting monthly invoices for transportation services to DVA beginning in January 1999. DVA began payment on the invoices starting on March 4, 1999.

According to the plaintiff's complaint, on August 4, 1999, Specialty and DVA met to discuss payment issues under the contract. During the meeting, DVA again identified a number of problems with Specialty's performance, including Specialty's billing practices on multiple-passenger trips. On August 5, 1999, DVA notified Specialty by memorandum that, "your company has been transporting multiple riders without VACT [Veterans Affairs Connecticut Healthcare System] authorization and attempting to bill the VA as if each trip were individual."

On October 11, 1999, Specialty sent a letter to DVA's CO Guenzel, with reference to "billing discrepancies that we are currently having" for the transportation service. The letter stated:

Regardless of the number of patients transported concurrently on a single trip *beyond* city limits, the contractor will be reimbursed for the *mileage rate* for only one trip to the longest distance traveled with any one patient that particular trip. Base rate per patient shall not be altered regardless of the number of patients transported concurrently (outside city limits) only mileage shall be a factor as per your contract.

Therefore, I expect full payment for all trips performed less any mileage on concurrent transports outside of city limits.

(Emphasis in original).

Specialty sent another letter on October 11, 1999, informing the defendant that it had not received a preliminary written notice of the defendant's intention to extend the con-

tract pursuant to contract clause 52.217–9. Due to defendant's failure to notify the plaintiff of the extension, the plaintiff concluded: "Therefore, Specialty Transportation, Inc., will terminate services at midnight, November 30, 1999 with the exception of any transports that are in progress."

On October 20, 1999, the DVA contracting officer, Mr. Guenzel, issued Contract Modification No. 2, extending the contract for a four month period, from December 1, 1999 through March 31, 2000, pursuant to contract clause 52.217–8. Accompanying the October 20, 1999 contract modification, CO Guenzel notified Speciality that "in accordance with Section C, Number of Patients, VA is going to continue to reimburse Specialty the base rate for one trip, regardless of the number of patients transported concurrently on a single trip and regardless of whether the trip is within the city limits or beyond the city limits."

By letter dated November 10, 1999 to the DVA's contracting officer, Specialty's President addressed payment issues and further performance of the contract. The November 10, 1999 letter stated the following:

This letter is pursuant to your meeting with Bennett Grossman today. The discussion involved the fact that the VA Healthcare System is denying payment of $24,274.57 from June 1999 through September 1999, and an additional amount of $6,439.00 from December 1998 through May 1999. The total amount is $30,713.57 for services performed by Specialty Transportation, Inc. Therefore, the VA Connecticut Healthcare System is in breach of our contract.

Using the formula of the VA's past history in denying payment, Specialty will lose approximately $6,068.64 per month from June 1999 through March 2000, the deficiency will be upwards of $70,000.00.

I can not put my company in financial ruin while we all wait for a third opinion to determine Specialty's fate. Our expenses exceed the revenue that our company is currently receiving. Therefore, Specialty's solvency will deteriorate day by day with the denial of the above funds and future funds. In conclusion, if the amount if

$30,713.57, which is in question at this time is not wired into our bank account by November 20, 1999 we will have to cease services for the VA at midnight November 30, 1999 as per our previous letter dated October 11, 1999. This action must be taken immediately to protect our financial interest.

On November 16, 1999, CO Guenzel issued a Contracting Officer's Final Decision on the plaintiff's claim of $30,713.57. The Final Decision summarized the pertinent provisions of Section C of the contract, which addressed billing on multiple passenger trips and charges for late pickups and stated that "based on the contract specifications in Section C and the procedures used in determining what deductions are to be made from each invoice, Specialty Transportation's request to be paid the amount of $30,713.57 is denied." The Contracting Officer's Final Decision also reiterated plaintiff's obligation to comply with Section C, subsection "Orders," which required the contractor to continue transportation services or to reimburse DVA if other transportation services were used which could result in additional costs to DVA.

The plaintiff acknowledged receipt of the Contractor Officer's November 16, 1999 Final Decision by letter dated November 23, 1999. The plaintiff's November 23, 1999 letter also informed the defendant that Specialty would cease contract performance at "midnight November 30, 1999."

CO Guenzel, by letter dated November 29, 1999, provided Specialty a "Show Cause Notice," which informed the plaintiff of the following:

Since you have stated in your letter dated November 23, 1999 that you will stop providing services as of midnight, November 30, 1999, resulting in your failure to perform Contract V689P–2563 within the time required by its terms, the Government is considering terminating the contract under the provisions for cause of this contract. Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose from causes beyond your control and without fault or negligence on your part. Accordingly, you are given the opportunity to present, in writing, any facts bearing on the question to Conrad Guenzel, Contracting Officer, VA Connecticut Healthcare System, 40 Industry Drive, West Haven, CT 06516, within 10 days after receipt of this notice. Your failure to present any excuses within this time may be considered as an admission that none exist. Your attention is invited to the respective rights of the Contractor and the Government and the liabilities that may be invoked if a decision is made to terminate for cause.

Specialty responded to the Show Cause Notice by letter dated December 7, 1999, and stated that "it was your failure to pay for services provided that has led to our termination of the contract within its terms." By letter dated December 16, 1999, DVA terminated the contract for cause, and stated that "[d]ue to your failure to provide chair car services from December 1, 1999 to the present, contract # V689P–2563, dated November 6, 1998 is hereby terminated effective December 1, 1999 in accordance with FAR clause 52.212–4(m) Termination for Cause. Your right to proceed further under this contract is terminated."

On November 30, 1999, the DVA requested proposals for performance of the chair car services from the date of award through March 31, 2000. The DVA requested proposals from three companies and the DVA received one response. The DVA requested further proposals, and on December 10, 1999, American Medical Response of CT, Inc. entered into a contract with the DVA to provide the chair car services.

By letter dated February 29, 2000, Specialty submitted another billing statement to the DVA's contracting officer, Conrad Guenzel, and claimed a corrected, increased balance due on the contract in the amount of $64,216.57. The parties agree that the DVA has refused to pay the amounts requested by Specialty and has stated, in response to interrogatories, that DVA "does not intend to make such payment."

## DISCUSSION

The plaintiff's amended complaint appeals the contracting officer's denial of Specialty's

claims totaling $64,216.57 allegedly due under the contract. The amended complaint claims that "[t]he clear language of the Contract entitled Specialty Transportation to reimbursement for multiple base trips when transporting multiple passengers outside city limits." The complaint further alleges that "[t]he Contracting Officer's refusal to pay the amounts owed to Specialty Transportation for services it performed, including multiple passenger trips outside city limits, violated the terms of the contracts [sic] and constituted a material breach of the contract." The plaintiff contends that the contracting officer's decision to deny the amounts claimed by Specialty under the contract was arbitrary, capricious, and in violation of law.

The plaintiff also has challenged the defendant's termination of the contract for cause. As discussed above, the plaintiff originally filed an appeal with the Department of Veteran Affairs, Board of Contract Appeals, seeking review of the contracting officer's decision to terminate the contract. Following the consolidation of the plaintiff's appeal before the Department of Veteran Affairs, Board of Contract Appeals with the above captioned case, the plaintiff moved for summary judgment on its claim that the contracting officer wrongfully terminated the contract for cause. The plaintiff asserts "[g]iven that Specialty was justified in refusing to continue performance during the extension period, the DVA's termination for cause was arbitrary, unreasonable and contrary to applicable law and the terms of the contract. Therefore, Specialty is entitled to judgment as a matter of law."

In its answer, the defendant alleged a counterclaim against the plaintiff for $9,784.44, plus interest. The defendant alleges that "[a]s a result of Specialty Transportation's failure to perform on the contract from December 1, 1999, through December 16, 1999, the VA incurred $9,784.44 in expenses over and above what it would have paid Specialty Transportation, had Specialty Transportation completed performance on the contract."

The parties have filed cross-motions for summary judgment on the plaintiff's complaint and the defendant's counterclaim pursuant to Rule 56 of the Rules of the Court of Federal Claims (RCFC).[2] RCFC 56 is patterned on Rule 56 of the Federal Rules of Civil Procedure (Fed.R.Civ.P.) and is similar both in language and effect. Both rules provide that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); Fed.R.Civ.P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed.Cir.), *reh'g denied and reh'g en banc denied* (2001); *Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d 1253, 1257 (Fed.Cir.2001); *Avenal v. United States*, 100 F.3d 933, 936 (Fed.Cir. 1996), *reh'g denied* (1997); *Creppel v. United States*, 41 F.3d 627, 630–31 (Fed.Cir.1994). A fact is material if it will make a difference in the result of a case under the governing law. Irrelevant or unnecessary factual disputes do not preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48, 106 S.Ct. 2505; *see also Monon Corp. v. Stoughton Trailers, Inc.*, 239 F.3d at 1257; *Curtis v. United States*, 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216 (1958), *cert. denied*, 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *reh'g denied*, 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When reaching a summary judgment determination, the judge's function is not to weigh the evidence and determine the truth of the case presented, but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249, 106 S.Ct. 2505; *see, e.g., Ford Motor Co. v. United States*, 157 F.3d 849, 854 (Fed.Cir. 1998) (the nature of a summary judgment proceeding is such that the trial judge does not make findings of fact); *Johnson v. Unit-*

---

**2.** After careful review of the materials submitted to the court, the court deems oral argument on the parties' motions for summary judgment unnecessary.

*ed States,* 49 Fed.Cl. 648, 651 (2001), *aff'd,* 52 Fed.Appx. 507 (Fed.Cir.2002); *Becho, Inc. v. United States,* 47 Fed.Cl. 595, 599 (2000). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether the issues presented are so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250–52, 106 S.Ct. 2505; *Jay v. Sec'y of Dep't of Health and Human Servs.,* 998 F.2d 979, 982 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1993). When the record could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial, and the motion must be granted. *See, e.g., Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Hall v. Aqua Queen Mfg., Inc.,* 93 F.3d 1548, 1553 n. 3 (Fed.Cir.1996). In such a case, there is no need for the parties to undertake the time and expense of a trial, and the moving party should prevail without further proceedings. Summary judgment:

> saves the expense and time of a full trial when it is unnecessary. When the material facts are adequately developed in the motion papers, a full trial is useless. "Useless" in this context means that more evidence than is already available in connection with the motion for summary judgment could not reasonably be expected to change the result.

*Dehne v. United States,* 23 Cl.Ct. 606, 614–15 (1991) (citing *Pure Gold, Inc. v. Syntex, Inc.,* 739 F.2d 624, 626 (Fed.Cir.1984)), *vacated on other grounds,* 970 F.2d 890 (Fed.Cir.1992); *United States Steel Corp. v. Vasco Metals Corp.,* 55 C.C.P.A. 1141, 394 F.2d 1009, 1011 (C.C.P.A.1968).

Summary judgment, however, will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. 2505; *Eli Lilly & Co. v. Barr Labs., Inc.,* 251 F.3d 955, 971 (Fed.Cir.2001), *cert. denied,* 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 879 (2002); *Gen. Elec. Co. v. Nintendo Co.,* 179 F.3d 1350, 1353 (Fed.Cir.

1999). In other words, if the nonmoving party produces sufficient evidence to raise a question as to the outcome of the case, then the motion for summary judgment should be denied. Any doubt over factual issues must be resolved in favor of the party opposing summary judgment, to whom the benefit of all presumptions and inferences runs. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. at 587–88, 106 S.Ct. 1348; *Monon Corp. v. Stoughton Trailers, Inc.,* 239 F.3d at 1257; *Wanlass v. Fedders Corp.,* 145 F.3d 1461, 1463 (Fed.Cir.), *reh'g denied and en banc suggestion declined* (1998).

The initial burden on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact may be discharged if the moving party can demonstrate that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Trilogy Communications, Inc. v. Times Fiber Communications, Inc.,* 109 F.3d 739, 741 (Fed.Cir.) (quoting *Conroy v. Reebok Int'l, Ltd.,* 14 F.3d 1570, 1575 (Fed.Cir.1994), *reh'g denied and en banc suggestion declined* (1995)), *reh'g denied and en banc suggestion declined* (1997); *Lockwood v. Am. Airlines, Inc.,* 107 F.3d 1565, 1569 (Fed.Cir.1997). If the moving party makes such a showing, the burden shifts to the nonmoving party to demonstrate that a genuine dispute regarding a material fact exists by presenting evidence which establishes the existence of an element essential to its case upon which it bears the burden of proof. *See Celotex Corp. v. Catrett,* 477 U.S. at 322, 106 S.Ct. 2548; *Am. Airlines v. United States,* 204 F.3d 1103, 1108 (Fed. Cir.2000); *see also Schoell v. Regal Marine Indus., Inc.,* 247 F.3d 1202, 1207 (Fed.Cir. 2001).

Pursuant to RCFC 56, a motion for summary judgment may succeed whether or not accompanied by affidavits and/or other documentary evidence in addition to the pleadings already on file. *Celotex Corp. v. Catrett,* 477 U.S. at 324, 106 S.Ct. 2548. Generally, however, in order to prevail by demonstrating that a genuine issue for trial exists, the nonmoving party must go beyond the pleadings

8

by use of evidence such as affidavits, depositions, answers to interrogatories and admissions. *Id.*

Even if both parties argue in favor of summary judgment and allege an absence of genuine issues of material fact, however, the court is not relieved of its responsibility to determine the appropriateness of summary disposition in a particular case. *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988) (citing *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987)); *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1037 n. 5 (9th Cir. 2000), *cert. denied*, 532 U.S. 942, 121 S.Ct. 1403, 149 L.Ed.2d 346 (2001). "[S]imply because both parties moved for summary judgment, it does not follow that summary judgment should be granted one or the other." *LewRon Television, Inc. v. D.H. Overmyer Leasing Co.*, 401 F.2d 689, 692 (4th Cir.1968), *cert. denied*, 393 U.S. 1083, 89 S.Ct. 866, 21 L.Ed.2d 776 (1969); *see also B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d 587, 593 (6th Cir.2001); *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). Cross-motions are no more than a claim by each party that it alone is entitled to summary judgment. The making of such inherently contradictory claims, however, does not establish that if one is rejected the other necessarily is justified. *B.F. Goodrich Co. v. U.S. Filter Corp.*, 245 F.3d at 593; *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir.2000); *Allstate Ins. Co. v. Occidental Int'l., Inc.*, 140 F.3d 1, 2 (1st Cir.1998); *Reading & Bates Corp. v. United States*, 40 Fed.Cl. 737, 748 (1998). The court must evaluate each party's motion on its own merits, taking care to draw all reasonable inferences against the party whose motion is under consideration. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed.Cir. 2001); *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1338–39 (Fed.Cir.2001), *cert. denied*, 534 U.S. 1114, 122 S.Ct. 921, 151 L.Ed.2d 886 (2002). After reviewing the parties' submissions, the court finds that there are no material facts in dispute to impede resolving the plaintiff's claims, or to resolve the liability portion of the defendant's counterclaim. There is in the record, however, insufficient information to resolve the question of damages due pursuant to the defendant's counterclaim.

■ The defendant's motion for summary judgment states that "[t]his dispute concerns payment for the transportation of more than one patient at a time, beyond the city limits." The plaintiff's cross-motion for summary judgment states that when "Specialty submitted its bid on the Contract, it interpreted the Contract provisions to allow it to bill multiple base rates when transporting multiple passengers beyond city limits." The parties agree that under Section C of the contract, Speciality was to be paid a single base rate for either single or multiple passenger car chair service trips within the twenty-five mile city limit. In other words, the contract provided that Specialty would be paid a base rate, regardless of the number of passengers transported on one trip within the twenty-five mile city limit. The parties also agree that when Specialty transported multiple passengers outside the twenty-five mile city limit, Specialty was to be paid an additional sum for the longest distance traveled. For example, if Speciality transported two passengers from the DVA Campus and dropped-off the first passenger five miles outside the twenty-five mile city limit and the second passenger ten miles outside the twenty-five mile city limit, Specialty would be reimbursed for the mileage charge for the longer distance.

The parties diverge in their interpretation of the contract regarding whether, under the terms of the contract, the plaintiff was to be paid multiple base rates for each passenger transported outside of the twenty-five mile city limit on multiple passenger trips. The defendant states in its motion for summary judgment that "[t]hus, under the plain terms of the contract, the base rate specified for trips within city limits applied to both trips entirely within the city and trips beyond the city limits-the only difference between the two types of trips was that the latter carried an extra mileage charge." Stated otherwise, the defendant asserts: "[T]he contract is clear that DVA will only pay a single base rate for each trip, plus additional mileage to the longest distance traveled with any one patient on the trip." In contrast, as noted

above, the plaintiff states in its cross-motion for summary judgment that "[w]hen Specialty submitted its bid on the Contract, it interpreted the Contract provisions to allow it to bill multiple base rates when transporting multiple passengers beyond city limits."

The United States Court of Appeals for the Federal Circuit stated in *Jowett, Inc. v. United States* that:

> In interpreting a contract, we begin with the plain language. We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning. In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.

*Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 (Fed.Cir.2000) (citations omitted); *see also Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1372 (2002) ("We begin with the plain language when interpreting a contract.... The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts.") (citations omitted); *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir.2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.") (citations omitted). Thus, if the "provisions are clear and unambiguous, they must be given their plain and ordinary meaning," *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed.Cir.), *reh'g denied* (1993).

When the terms of a contract are clear and unambiguous, there is no need to resort to extraneous circumstances for its interpretation. *See Sea–Land Serv., Inc. v. United States*, 213 Ct.Cl. 555, 567, 553 F.2d 651, 658 (1977), *cert. denied*, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Construction of an unambiguous writing, therefore, is an appropriate matter for summary judgment. *See Martin v. United States*, 20 Cl.Ct. 738, 745 (1990); *Kelley v. United States*, 19 Cl.Ct. 155, 161 (1989). A written agreement is ambiguous when a plain reading of the contract could result in more than one reasonable interpretation. *See Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir.1999); *Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 997 (Fed.Cir.1996); *A–Transport Northwest Co., Inc. v. United States*, 36 F.3d 1576, 1584 (Fed.Cir.1994) ("A contract is ambiguous only when it is susceptible to two reasonable interpretations."); *Tacoma Dept. of Pub. Utils. v. United States*, 31 F.3d 1130, 1134 (Fed.Cir.1994) (citing *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed.Cir.1992)). It is not enough that the parties differ in their interpretation of the contract clause. *See Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1578 (Fed.Cir.1993). Nor may a court look to extrinsic evidence in determining whether a contract is ambiguous. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed.Cir.1996); *Tacoma Dep't of Pub. Utils. v. United States*, 31 F.3d at 1134 ("Outside evidence may not be brought in to create an ambiguity where the language is clear."); *Interwest Constr. v. Brown*, 29 F.3d 611, 615 (Fed.Cir.1994) ("Extrinsic evidence ... should not be used to introduce an ambiguity where none exists."). However, because an ambiguous or uncertain writing sometimes can only be understood upon consideration of the surrounding circumstances, extrinsic evidence will be allowed to interpret an ambiguous clause. *See Sylvania Elec. Prods., Inc. v. United States*, 198 Ct.Cl. 106, 126, 458 F.2d 994, 1005 (1972).

The language of the contract at the heart of the dispute between the parties is found in the subsections of Section C, titled "Number of Patients" and "Rates." The subsection titled "Number of Patients" states:

> It is understood and agreed that only one patient shall be transported on a trip unless specifically authorized by the VA. When, pursuant to the VA's authorization, more than one patient is transported concurrently on a trip, reimbursement will be made only at the rates contained in the Schedule for transporting a single patient. Regardless of the number of patients transported concurrently on a single trip within city limits, the contractor will be reimbursed for only the base rate for one

trip. Regardless of the number of patients transported concurrently on a single trip beyond the city limits, the contractor will be reimbursed for the mileage rate for only one trip to the longest distance traveled with any one patient one [sic][3] that particular trip.

The subsection titled "Rates" provides, in relevant part:

Payment for mileage traveled beyond the 25 mile radius shall be one way only. Such mileage costs will be paid in addition to the applicable rate per trip for any trip entirely within the limits. The chair car basic rate will be applicable where both the origin and destination are within any one town. If the chair car returns for the patient, it is considered to be a second trip. Mileage is to be applied from point of origin to final destination. Trip mileage shall be determined by the latest edition of the Rand McNally Standard Mileage Guide.

Under the "Number of Patients" subsection, the contract addressed the number of passengers who would be transported on each trip, and provided that "only one patient shall be transported on a trip unless specifically authorized by the VA." When the defendant authorized multiple passenger trips, the contract stated the following regarding the number of reimbursable "base rates": "When, pursuant to the VA's authorization, more than one patient is transported concurrently on a trip, reimbursement will be made only at the rates contained in the Schedule for transporting a single patient." The next sentence of the "Number of Patients" subsection addressed the question of the number of "base rates" the contractor is entitled to when there are multiple passengers being transported within the twenty-five mile city limit: "Regardless of the number of patients transported concurrently on a single trip within city limits, the contractor will be reimbursed for only the base rate for one trip." The following sentence of the same "Number of Patients" subsection allows for an additional payment to the plaintiff based on the

farthest distance traveled outside of the twenty-five mile city limit and provides that, "[r]egardless of the number of patients transported concurrently on a single trip beyond the city limits, the contractor will be reimbursed for the mileage rate for only one trip to the longest distance traveled with any one patient on[ ] that particular trip."

"Contract interpretation is a question of law generally amenable to summary judgment." *Varilease Tech. Group, Inc. v. United States,* 289 F.3d 795, 798 (Fed.Cir.2002); *see also Castle v. United States,* 301 F.3d 1328, 1337 (Fed.Cir.2002) ("Contract interpretation is a question of law. . . ."); *Hunt Constr. Group, Inc. v. United States,* 281 F.3d 1369, 1372 (Fed.Cir.2002). Moreover, "[c]ontract interpretation is a matter of law for this court to determine." *Neal & Co. v. United States,* 945 F.2d 385, 390 (Fed.Cir. 1991); *Blake Constr. Co. v. United States,* 987 F.2d 743, 746 (Fed.Cir.), *cert. denied,* 510 U.S. 963, 114 S.Ct. 438, 126 L.Ed.2d 372 (1993) (finding that a question of contract interpretation "is a matter of law for this court to decide."); *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed.Cir.1984); *see also Metcalf Constr. Co. v. United States,* 53 Fed.Cl. 617, 628 (2002) (finding plaintiff's claim "raises a contract interpretation issue, which is a question of law to be decided by the court.").

Reading the contract, the court finds consistent indications in the words of the contract that permitted the plaintiff to charge only one "base rate" on trips outside the twenty-five mile city limit for multiple passengers, as was the case under the contract for multiple passenger trips within the twenty-five mile city limit. Although it is correct that the words in the "Number of Patients" subsection of Section C of the contract, regarding transportation within the city limits of multiple passengers provides that "the contractor will be reimbursed for only the base rate for one trip," and the companion sentence for multiple passengers transported outside the twenty-five mile city limit are not identical, the words of the contract, when

---

**3.** The parties have not addressed and the court does not consider the typographical error in the subsection to be relevant to the resolution of the

parties dispute and, therefore, presumably, the phrase "one patient one that particular trip" should read "one patient on that particular trip."

read as a whole, make it clear that a consistent approach allowing only one base rate plus the mileage rate for trips outside the twenty-five mile city limit is the correct reading of the contract language.

The plain words of the last sentence of the Section C portion titled "Number of Patients," addresses how to charge for a trip beyond the twenty-five mile city limit with multiple passengers. The sentence states: "[T]he contractor will be reimbursed for the mileage rate for only one trip to the longest distance traveled with any one patient on[ ] that particular trip." The "mileage rate," referred to in the last sentence of Section C titled "Number of Patients" is determined by calculations made in accordance with the "Rates" subsection of Section C of the contract. The "Rates" subsection of the contract establishes a formula for making the payment for mileage traveled beyond the twenty-five mile city limit one way and states that the contractor shall be paid mileage cost "in addition to the applicable rate per trip for any trip entirely within the limits." The single sentence in the "Rates" subsection ties the additional "mileage costs" earned from multiple passengers being transported outside of the twenty-five mile city limits—to the "applicable rate" for trips within the twenty-five mile city limits. That "applicable rate" within the twenty-five mile city limit is a single base rate, regardless of the number of passengers. For multiple passenger trips outside the twenty-five mile city limit, the last sentence of the "Number of Patients" subsection of Section C directs the parties to determine the mileage rate for "only one trip," not for multiple trips, "to the longest distance traveled." Moreover, to read the phrase "applicable rate per trip for any trip entirely within the limits," as allowing a "base rate" for each passenger on a multiple passenger trip outside the twenty-five mile city limit would be inconsistent with the simple "base rate" conclusion for multiple passenger trips that are made entirely within the twenty-five mile city limit.

The contract signed by the parties establishes that the contractor was entitled to a single passenger base rate for all multiple passenger trips, and if the contractor traveled outside of the twenty-five mile city limit, the contractor was entitled to an additional mileage rate based on the longest distance traveled. When the "Number of Patients" subsection is read together with the "Rates" subsection of Section C, the court finds that the plaintiff is not entitled to a "base rate" for each passenger on a multiple passenger trip outside of the twenty-five mile city limit.

The defendant's motion for summary judgment also requests the court to find against the plaintiff's claim alleging that the defendant improperly terminated the contract for cause, first brought by the plaintiff in its appeal before the Department of Veteran Affairs, Board of Contract Appeals, and consolidated with this case by the court's July 19, 2001 order. The defendant asserts that "[b]ecause the contract had been properly extended for four months, until March, 2000, and because Specialty ceased performance on November 30, 1999, DVA properly exercised its right to terminate Specialty for defaulting on its performance under the contract."

The plaintiff argues in its cross-motion for summary judgment that because the defendant improperly withheld payments for multiple passenger trips outside of the twenty-five mile city limit, the defendant was in material breach of the contract, justifying the plaintiff's right to refuse to perform under the contract. The plaintiff asserts that "given the Government's continued refusal to pay amounts due, Specialty was entitled to stop performance at the end of the base year and the termination for cause was improper."

The contract incorporated the termination for cause provision contained in FAR section 52.212–4(m), which provides in relevant part:

(m) *Termination For Cause.* The Government may terminate this contract, or any part hereof, for cause in the event of any default by the Contractor, or if the Contractor fails to comply with any contract terms and conditions, or fails to provide the Government, upon request, with adequate assurances of future performance. In the event of termination for cause, the Government shall not be liable to the Contractor for any amount for supplies or services not accepted, and the Contractor shall be liable to the Govern-

ment for any and all rights and remedies provided by law. If it is determined that the Government improperly terminated this contract for default, such termination shall be deemed a termination for convenience.

48 C.F.R. § 52.212–4(m) (1998).

■ The contracting officer has broad discretion to determine whether to terminate a contract for default and a court should only overturn that decision if it is arbitrary, capricious or constitutes an abuse of discretion. *Consol. Indus., Inc. v. United States*, 195 F.3d 1341, 1343–44 (Fed.Cir.1999). "In deciding whether to terminate a contract for default, the CO is required to exercise his discretion, to make sure that termination is in the best interests of the Government." *Nuclear Research Corp. v. United States*, 814 F.2d 647, 649 (Fed.Cir.1987). As the United States Court of Appeals for the Federal Circuit has held:

> Properly understood, then, *Schlesinger [v. United States*, 182 Ct.Cl. 571, 390 F.2d 702 (1968)] and its progeny merely stand for the proposition that a termination for default that is unrelated to contract performance is arbitrary and capricious, and thus an abuse of the contracting officer's discretion. This proposition itself is but a part of the well established law governing abuse of discretion by a contracting official.

*McDonnell Douglas Corp. v. United States*, 182 F.3d 1319, 1326 (Fed.Cir.1999), *cert. denied*, 529 U.S. 1097, 120 S.Ct. 1831, 146 L.Ed.2d 775 (2000). A contractor's "[f]ailure to meet contract specifications and inability to meet the contract delivery schedule are of course relevant considerations to whether a contractor is in default." *Id.* at 1328. Moreover, the *McDonnell Douglas* court wrote that:

> The cost to complete a contract—more particularly, the inability of a contractor to perform a contract at the specified contract price—and the ability to meet a contract schedule are both fundamental elements of government contracts and are related to contract performance; as such, they are highly relevant to the question of default.

*Id.* "To summarize, the government may not use default as a pretext for terminating a contract for reasons unrelated to performance; instead, there must be a nexus between the government's decision to terminate for default and the contractor's performance." *Id.* at 1329. The same review standards are applicable to the termination for cause provision of FAR 52.212–4(m).

■ The contracting officer, Mr. Guenzel, issued Contract Modification No. 2 on October 20, 1999, extending the contract for a four month period, from December 1, 1999 through March 31, 2000, pursuant to FAR contract clause 52.217–8, Option to Extend Services. Clause 52.217–8 provided the contracting officer the authority to "continue[ ] performance of any services within the limits and at the rates specified in the contract." The plaintiff, therefore, was required to continue performance of the contract from December 1, 1999 through March 31, 2000. Following the receipt of the plaintiff's letter dated November 10, 1999, requesting payment of $30,713.57 for services performed by Specialty, CO Guenzel issued a Contracting Officer's Final Decision, on November 16, 1999, denying the plaintiff's claim. The November 16, 1999 Contracting Officer's Final Decision also reiterated plaintiff's obligation to comply with the subsection titled "Orders," of Section C of the contract, which obliged the contractor to continue transportation services or be required to reimburse DVA if other transportation services were used, resulting in additional costs to DVA. By letter dated November 23, 1999, however, Specialty informed the defendant that it would cease contract performance at "midnight November 30, 1999."

On November 29, 1999, CO Guenzel provided Specialty a "Show Cause Notice," which informed the plaintiff that "the Government is considering terminating the contract under the provisions for cause of this contract." By letter dated December 16, 1999, DVA terminated the contract for cause, and stated that "[d]ue to your failure to provide chair car services from December 1, 1999 to the present, contract # V689P–2563, dated November 6, 1998 is hereby terminated effective December 1, 1999 in accordance

with FAR clause 52.212–4(m) Termination for Cause. Your right to proceed further under this contract is terminated."

The contracting officer's decision to terminate the contract for cause is well supported by the plaintiff's failure to perform under the contract. The plaintiff received Contract Modification No. 2, which obligated the contractor to continue performance of the contract from December 1, 1999 through March 31, 2000. The plaintiff failed to perform the contract following November 30, 1999, and such failure to perform was the basis for the contracting officer's exercise of discretion to terminate the contract for cause.

Because the court has found that the plain language of the contract does not support the plaintiff's argument that it should have been reimbursed for multiple "base rates" for multiple passenger trips outside the twenty-five mile city limit, the plaintiff's position that Specialty's failure to perform the contract from December 1, 1999 through March 31, 2000 was justified by the defendant's failure to reimburse the plaintiff in accordance with what Specialty considered to be the terms of the contract must fail. Based on the terms of the contract entered into by Speciality, the plaintiff was obligated to continue performance of the contract and the contracting officer properly terminated the contract for cause upon Speciality's failure to perform. The court, therefore, does not find that the contracting officer acted arbitrarily, capriciously, or abused his discretion.

■ The defendant's amended counterclaim asserts a claim for $9,784.44 "in expenses over and above what it would have paid Specialty Transportation, had Specialty Transportation completed performance on the contract." The defendant has moved for summary judgment on its counterclaim and asserts that "Specialty's failure to perform under the contract after November 30, 1999, violated the terms of the modification that extended the contract until the end of March 2000."

The plaintiff asserts a number of arguments in support of its position that the defendant is not entitled to any damages associated with obtaining transportation services after November 30, 1999. The plaintiff argues that the defendant's termination for cause was improper, and that, therefore, the defendant is not entitled to damages, the costs in the counterclaim appear to be duplicative of the costs that have already been withheld from the plaintiff, and the defendant's counterclaim is barred because of the defendant's failure to assert the claim in its answer before the Department of Veteran Affairs, Board of Contract Appeals.

At the outset, the court notes that according to the Board of Contract Appeals:

> In this connection, it is noted that in practice before the Board of Contract Appeals, it is not compulsory that all claims against the prosecuting party which arise out of the same subject matter as that party's claim be filed as a counterclaim, for such a doctrine would be contrary to [41 U.S.C.] § 605(a).

*In re TDC Mgmt. Corp.*, D.O.T.B.C.A. No. 1802, 91–2 B.C.A. (CCH) ¶ 23,815, 119,257, 1991 WL 32090 (1991) (citing *In re Norcoast–Beck Aleutian, A Joint Venture*, A.S.B.C.A. No. 26389, 83–1 B.C.A. ¶ 16,152, 1982 WL 7936 (1982); *In re McDonnell Douglas Corp.*, A.S.B.C.A. No. 26747, 83–1 B.C.A. ¶ 16,377, 81,423–81,424, 1983 WL 7475 (1983); *In re MGM Contracting Co.*, A.S.B.C.A. No. 26895, 83–1 B.C.A. ¶ 16,191, 1982 WL 7951 (1982); *In re Rough and Ready Timber Co.*, A.G.B.C.A. Nos. 82–101–3 et al., 82–1 B.C.A. ¶ 15,493, 1981 WL 7006 (1981)).

In this court, RCFC 13(a) provides:

> Compulsory Counterclaims. The answer shall state as a counterclaim any claim which, at the time of serving the answer, the defendant has against any plaintiff, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction.

The contracting officer's termination for cause notice, issued on December 16, 1999, provided that "[t]he Government intends to seek any and all remedies provided by law or under the contract, to include acquiring similar services from another contractor and charging Specialty, the defaulted contractor,

with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination." The defendant's counterclaim was included in the defendant's answer to the plaintiff's complaint in this court, arises out of the same contract the plaintiff has sued upon in this court, and does not require the presence of third parties. Pursuant to 28 U.S.C. §§ 1503 and 2508, as well as the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613, this court may exercise jurisdiction over defendant's counterclaim.

As discussed above, the contracting officer, through Contract Modification No. 2, extended the contract for a four month period, from December 1, 1999 through March 31, 2000, pursuant to contract clause 52.217–8. The plaintiff was required to continue performance of the contract from December 1, 1999 through March 31, 2000. The contracting officer also provided the plaintiff notice in his final decision of November 16, 1999, that Specialty was obligated to comply with the subsection "Orders," of Section C of the contract. Pursuant to the subsection "Orders," the contract permitted the DVA to procure transportation services from another provider and charge the plaintiff for excess charges, as follows:

If the contractor fails to furnish requested services, within 30 minutes after receiving a request for unscheduled service or within 15 minutes of the scheduled pick-up time for appointments made in advance, the VA reserves the right to obtain services from another source and to charge the contractor with any excess cost which may result therefrom.

The plaintiff ceased performance of the contract on November 30, 1999. The plaintiff, therefore, is liable to the defendant for excess costs associated with the services the DVA was required to obtain from December 1, 1999 through December 16, 1999.

Based on the filings submitted to the court to date, the court, however, is unable to determine the amount of damages associated with the services the DVA obtained from December 1, 1999 through December 16, 1999. The defendant has submitted documents titled by the defendant as "Travel Output statements from Nov. 30–Dec. 18, 1999." The documents themselves, however, are titled "Beneficiary Travel Output By Carrier From Nov 30, 1999 to Dec 1999," and the dates of those documents exceed the time period for additional costs for procuring transportation services claimed by the defendant. Moreover, the defendant's brief in support of its motion for summary judgment states that "[a]ccording to the Contracting Officer, this amount [$9,784.44] has already been withheld from Specialty's final invoice. The Government is in no way attempting to recover this amount twice, it is merely taking precautionary measures to ensure its entitlement to this offset."

The court finds the plaintiff liable for the DVA's excess costs in obtaining transportation services from another source from December 1, 1999 through December 16, 1999, yet, due to the lack of evidence as to the actual amount of costs, if any, which may have been associated with obtaining the transportation services, the court finds the issue is not appropriate for summary judgment.

## CONCLUSION

As discussed above, the court GRANTS the defendant's motion for summary judgment on plaintiff's complaint and finds that the plain language of the contract does not entitle the plaintiff to be reimbursed for multiple base rates for multiple passenger trips outside the twenty-five mile city limit. In addition, the court finds that the termination of the contract for cause was properly based on the plaintiff's failure to perform the contract. Judgment is entered for the defendant on the plaintiff's complaint. The court also **GRANTS** the defendant's motion for summary judgment on the question of plaintiff's liability on the defendant's counterclaim for the excess costs of obtaining transportation services from another source after plaintiff ceased to perform during the remaining contract period. At this time, however, the court has insufficient information from the parties to determine the amount of damages, if any, due to the defendant at this time. The court, therefore, **ORDERS** the parties to meet and discuss with each other the

resolution of the damages portion of this case and if an agreement cannot be reached, to propose further proceedings to resolve the issue on damages of defendant's counterclaim. The parties shall file a joint status report addressing resolution of the damages claim on or before **Friday, May 30, 2003.**

**IT IS SO ORDERED.**